## UNITED STATES DISTRICT COURT
## DISTRICT OF RHODE ISLAND

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF THE CELLULAR TELEPHONE ASSIGNED CALL NUMBER 401-306-1386 AND IN THE MATTER OF TRACKING A 2010 TOYOTA VENZA, RHODE ISLAND REGISTRATION, LICENSE PLATE NUMBER VA385, VIN# 4T3BK3BB0AU043057 | SW No.   22-SW-014-PAS<br><br>**Filed Under Seal** |

## AFFIDAVIT IN SUPPORT OF
## AN APPLICATION FOR A SEARCH WARRANT

I, Juan Carlos Razon, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application for a search warrant under Federal Rule of Criminal Procedure 41 and 18 U.S.C. §§ 2703(c)(1)(A) for information about the location of the cellular telephone assigned call number 401-306-1386, with no listed subscriber, ("TARGET TELEPHONE"), and no listed address for the subscriber. However, I know this phone to be used by GREGORY ORTEGA. The service provider for the TARGET TELEPHONE is T-Mobile, a wireless telephone service provider headquartered at 4 Sylvan Way, Parsippany, NJ 07054. The TARGET TELEPHONE is described herein and in Attachment A-1, and the location information to be seized is described herein and in Attachment B.

2.      Because this warrant seeks the prospective collection of information, including cell-site location information, that may fall within the statutory definitions of information collected by a "pen register" and/or "trap and trace device," *see* 18 U.S.C. § 3127(3) & (4), the requested warrant is designed to also comply with the Pen Register Act. *See* 18 U.S.C. §§ 3121-

3127.  The requested warrant therefore includes all the information required to be included in an order pursuant to that statute.  *See* 18 U.S.C. § 3123(b)(1).

3. I also make this affidavit in support of an application for a search warrant under Federal Criminal Rule of Criminal Procedure 41 and 18 U.S.C. § 3117 to authorize the installation and monitoring of a tracking device on a 2010 white, Toyota Venza, bearing Rhode Island Registration License plate VA385[1] and Vehicle Identification Number (VIN) 4T3BK3BB0AU043057, ("TARGET VEHICLE"). The TARGET VEHICLE is described herein and in Attachment A-2.

4. I am a Special Agent of the Federal Bureau of Investigation ("FBI"), United States Department of Justice and have been employed in that capacity since March 2020. I am currently assigned to the Rhode Island Safe Streets Gang Task Force and investigate violent street gangs and drug/firearms trafficking organizations operating in and around the State of Rhode Island. Prior to my employment with the FBI, I worked as a Law Enforcement Officer in the City of Norfolk, Virginia from 2016-2020, where I worked as a uniformed patrol officer and a Detective investigating violent street crimes in and around the City of Norfolk.

5. I have authority to enforce the criminal laws of the United States and to make arrests.  I am a "federal law enforcement officer" within the meaning of Federal Rule of Criminal Procedure 41(a)(2)(C), that is, a government agent engaged in enforcing the criminal laws and duly authorized by the Attorney General to request a search warrant.

---

[1] Record Checks revealed Rhode Island VA385 to be registered to JENNIFER MELENDEZ, DOB: 1/23/1987, 182 Cumberland Street #67, Woonsocket, Rhode Island, The TARGET VEHICLE has been observed parked at 752 Social Street, Woonsocket, Rhode Island. A law enforcement database shows MELENEZ listed as both ORTEGA's girlfriend and wife.

6.      During my work with the FBI, I have participated in numerous investigations relating to the distribution of controlled substances, including fentanyl, heroin, cocaine, marijuana, designer drugs, illegal prescription drugs and other substances in violation of the federal controlled substances laws.  I have been the affiant on numerous arrest and search warrants, cellular telephone and Global Positioning Satellite (GPS) tracking warrants and wiretap applications.  I have participated in numerous other investigations in different capacities, such as monitoring court authorized wiretap conversations, physical surveillance, execution of search warrants, execution of arrest warrants, and other investigative methods.  Those investigations have resulted in arrests and convictions for violations of drug laws; seizures of drugs and firearms; and forfeiture of money and motor vehicles.  I have received training in the field of narcotics enforcement, investigations and apprehension of narcotics offenders.

7.      Through my training and experience I am familiar with the habits, methods, routines, practices and procedures commonly employed by persons engaged in the trafficking of illegal drugs.  Specifically, I am aware that drug traffickers commonly use cellular telephones in furtherance of their drug trafficking activities and frequently change cellular telephone numbers and cellular telephones in an effort to thwart law enforcement.

8.      In addition, I am familiar with the manner in which narcotics traffickers use telephones, coded language or slang, text messages, and the methods by which such persons attempt to disguise the subjects of their conversations and operations.  I am familiar with the typical price, packaging, and method of sale of narcotics in Rhode Island and various parts of the United States.

9.      Based on my training and experience and my participation in other controlled substance investigations, I know that it is common for drug dealers to: "front" (provide on

consignment) controlled substances to their customers; conceal contraband, the proceeds of drug sales, and store drugs and cash in remote locations sometimes referred to as "stash houses;" maintain records of drug transactions; and use cellular telephones to facilitate their drug distribution operations.  I also know that drug trafficking is an illicit business and an ongoing process requiring the development, use and protection of a communication network to facilitate daily drug distribution.  Drug dealers use various methods to thwart law enforcement detection, including frequently changing cellular phones and vehicles, using various aliases, and using coded communications.  Based on my experience in drug investigations, I know that drug traffickers frequently refer to illicit drugs in guarded conversations and frequently use code words when referring to controlled substances or money.

10.     I have participated in the below-described investigation. I am familiar with the facts and circumstances of this investigation based on information I have received from a variety of sources, including other law enforcement officers and agents, confidential sources, cooperating witnesses, public records, physical surveillance and telephone toll records.

11.     The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

12.     Based on the facts set forth in this affidavit, there is probable cause to believe that violations of 21 U.S.C. §§ 841(a)(1) and 846, distribution of controlled substances and conspiracy to distribute controlled substances, ("TARGET OFFENSES") have been committed, and will be committed by GREGORY ORTEGA (ORTEGA), date of birth 09/15/1989, utilizing the TARGET TELEPHONE.   There is also probable cause to believe that the location

4

information described in Attachment B will constitute evidence of the TARGET OFFENSES and will lead to the identification of individuals who are engaged in the commission of the Target Offenses.

13.     The court has jurisdiction to issue the proposed warrant because it is a "court of competent jurisdiction" as defined in 18 U.S.C. § 2711.  Specifically, the Court is a district court of the United States that has jurisdiction over the offense being investigated, *see* 18 U.S.C. § 2711(3)(A)(i).

14.     Based on the facts set forth in this affidavit, I also believe that the TARGET VEHICLE is presently being used in furtherance of the TARGET OFFENSES and that there is probable cause to believe that the installation of a tracking device on the TARGET VEHICLE and use of the tracking device will lead to evidence, fruits, and instrumentalities of the aforementioned crimes as well as to the identification of individuals who are engaged in the commission of those and related crimes.

### *Background, Sources, Methods, and Means*

15.     This investigation was initiated by the FBI Rhode Island Safe Streets Gang Task Force ("SSGTF"). This affidavit is based on my own investigation and on information reliably provided to me by other federal, state, and local law enforcement agents in Rhode Island. I have relied on information supplied by Agents, Troopers, Detectives, and Officers from the FBI, Rhode Island State Police (RISP), Providence Police Department (PPD), Woonsocket Police Department (WPD), Central Falls Police Department (CFPD), West Warwick Police Department (WWPD), Cranston Police Department (CPD), Pawtucket Police Department (PPD), and the United States Marshal's Office. I have also relied on reports of investigations that I have prepared or that were prepared by other law enforcement agents; business records, and public

and/or law enforcement databases. I have also relied on information provided to me and to other law enforcement agents by a Cooperating Witness who I will refer to only as "CW-1." In order to protect CW-1's identity, I will refer to CW-1 with a masculine pronoun regardless of CW-1's gender.

### Cooperating Witness #1

16.     CW-1 has been providing the FBI with information regarding the target of the investigation since approximately December 2021. CW-1 is motivated by fiscal means and will be compensated for his cooperation in this investigation. CW-1 has a criminal history that includes felony narcotics arrests, misdemeanor protection order violation charges, and property vandalism charges. Since the start of his cooperation, CW-1 has provided me with information that I or other law enforcement agents have independently corroborated through recorded conversations, video recordings, physical surveillance, and other law enforcement confidential sources. CW-1 has agreed to testify and has communicated with targets of this investigation by recorded voice and text messages, which has led to multiple controlled purchases of narcotics from the target of this investigation. I have never found CW-1 to have knowingly provided false information.

### Controlled Purchases

17.     Over the course of this investigation, CW-1 has participated in two controlled purchases of narcotics from ORTEGA. In each case, CW-1 arranged the drug deal by contacting ORTEGA on the TARGET TELEPHONE. On each occasion, the contact was by text messages, phone calls, or both, and a quantity of narcotics was ordered. The calls made by CW-1 were recorded and conducted in the presence of myself or another participating law enforcement officer. The text messages sent and received by CW-1 were photographed by me or another

participating law enforcement officer. On each occasion, law enforcement investigators checked CW-1 for contraband prior to the transaction to be sure that he was not already in possession of any narcotics, and that he did not have any additional cash on his person. CW-1 was then supplied with only enough official government funds for the purchase of the amount of narcotics that had been ordered. In addition, CW-1 was equipped with an audio and video recorder for all controlled buys in which he participated. CW-1 was followed to the transaction sites and surveillance was maintained near those locations. Following the transaction, CW-1 was followed to a predetermined meeting location where he turned over the narcotic evidence to me or another law enforcement officer working on this investigation. In each case, CW-1 was debriefed, and the audio and video recording devices were retrieved and reviewed. Additionally, a field test was performed on all of the drugs that had been purchased. In every instance, the field tests returned a positive indication for the presumptive presence of the drug that was purchased. Whenever I use the term "controlled purchase" in this affidavit, this is the procedure that we followed.

18.     After each controlled purchase, the drugs were secured as evidence and will be or have been submitted to the Rhode Island Department of Health Laboratory.

## SUMMARY OF PROBABLE CAUSE

1.     ***Wednesday, December 22, 2021 Controlled Purchase:*** On December 22, 2021, I met with CW-1 to purchase 10 grams of fentanyl from ORTEGA. In anticipation of the controlled purchase, members of the SSGTF initiated surveillance of 752 Social Street, Woonsocket, Rhode Island. Law enforcement knows this to be the home address of ORTEGA.

2.     At approximately 3:30 PM, CW-1 placed a consensually recorded phone call to ORTEGA on the TARGET TELEPHONE. This call was placed on speaker for me to listen. During the call, ORTEGA told CW-1 that he has to come to him because Ortega did not have his

car. CW-1 agreed and asked ORTEGA where he would like to meet. ORTEGA tells CW-1 to meet in Fairmont, near a parking lot in the park. CW-1 knows this area to be a parking lot in Dunn Park, located in Woonsocket, Rhode Island. CW-1 told ORTEGA he only had $600 for the fentanyl and ORTEGA agreed to the price for 10 grams of fentanyl. The call was ended after CW-1 and ORTEGA agreed on the location and price for the fentanyl. During the call, I overheard what sounded like a female's voice in the background of the recorded phone call.

3.      CW-1 explained that when someone wants to meet in Fairmont, he or she typically means the area of the Bourdon Boulevard Housing Authority property. Members of law enforcement are aware that ORTEGA's sister, JENNIFER ORTEGA ("J. ORTEGA"), lives at 42 Bourdon Boulevard, Woonsocket, Rhode Island. Members of the SSGTF initiated surveillance on that residence shortly after the call was ended.

4.      At approximately 3:48 PM, an investigator on surveillance observed the TARGET VEHICLE parked at 42 Bourdon Boulevard. Simultaneously, ORTEGA was observed walking into the residence wearing grey sweatpants and a black jacket.

5.      Pursuant to the procedures outlined above, CW-1 was searched, provided with an audio/video recording device, and $600 in Official Agency Funds (OAF). CW-1 was directed to proceed to the vicinity of Dunn Park, meet with ORTEGA, and purchase 10 grams of fentanyl.

6.      Members of law enforcement dropped CW-1 off near Dunn Park at approximately 3:50 PM, where he was continuously surveilled, and he arrived at the park shortly thereafter. While CW-1 was at Dunn Park, he placed a call to ORTEGA on the TARGET TELEPHONE, and he was advised by ORTEGA to meet him in the Bourdon Boulevard Housing Authority property. Members of law enforcement observed CW-1 walk from the park into the street of the Housing Authority property and behind the building, near 42 Bourdon Boulevard.

7.      Shortly thereafter, I observed CW-1 walking back from the area of Bourdon Boulevard toward the predetermined meeting location where he arrived at approximately 4:11 PM. CW-1 provided me with the recorder, and a clear plastic bag containing an off-white powdery substance consistent in color and texture with that of fentanyl. Pursuant to the procedures outlined above, CW-1 was searched for money and contraband with negative results. CW-1 was debriefed and informed me that as he arrived at Dunn Park, he placed a call to ORTEGA on the TARGET TELEPHONE. ORTEGA instructed CW-1 to walk down Bourdon Boulevard and walk behind the apartments near the woods. As CW-1 began walking toward the new meeting location, he observed ORTEGA walk from the porch of an apartment toward him. CW-1 explained ORTEGA was wearing grey sweatpants, a grey sweatshirt, and a black jacket over the sweatshirt. CW-1 handed ORTEGA the $600 of OAF for the 10 grams of fentanyl. Immediately thereafter, CW-1 walked back to the prearranged meeting location.

8.      Members of law enforcement conducted a field test of the suspected fentanyl, which field tested positive for the presence of fentanyl, with a total gross weight of approximately 9.5 grams. The suspected fentanyl will be submitted to the Rhode Island Department of Health Laboratory for further testing, to date no results have been returned.

9.      I reviewed the DVD containing the audio and video recording of the controlled purchase of fentanyl from ORTEGA. Although the exchange of narcotics for the OAF was not captured on video, I identified ORTEGA as the person CW-1 met with.

10.      ***Monday, January 3, 2022 Controlled Purchase:*** On Monday January 3, 2022, I met with CW-1 to purchase 10 grams of fentanyl from ORTEGA. In anticipation of a controlled purchase, the SSGTF initiated surveillance at 752 Social Street, Woonsocket, Rhode Island, ORTEGA's residence. The SSGTF observed a BMW X1 parked in the driveway bearing the

9

same Rhode Island Registration - VA385 as the TARGET VEHICLE. Across the street from

ORTEGA's residence, the TARGET VEHICLE was also observed, parked bearing Rhode Island

Registration – VA385. It is my belief that ORTEGA has removed the front license plate of the

TARGET VEHICLE and placed it on the BMW X1 that has been observed in the driveway of

his residence.

11.     At approximately 1:12 PM, a member of law enforcement observed ORTEGA

exit his residence, enter the TARGET VEHICLE, and drive away toward Downtown

Woonsocket. The SSGTF was unable to surveil the vehicle as he drove away.

12.     At approximately 1:14 PM, at my direction, CW-1 placed a consensually recorded

phone call to the TARGET TELEPHONE. The call was placed on speaker for me to listen,

however, there was no answer. Immediately thereafter, I instructed CW-1 to place a second call

to the TARGET TELEPHONE, which also went unanswered.

13.     At approximately 1:16 PM, at my direction, CW-1 sent a text message to the

TARGET TELEPHONE stating, "*Yo*" and "*WTW*". CW-1 knows "WTW" to mean, what's the

word.

14.     At approximately 1:22 PM, CW-1 received an incoming text message from the

TARGET TELEPHONE stating, "*Bro hold uo almost ready*". CW-1 believed the "uo" to be a

typo for "up".

15.     At approximately 1:44 PM, at my direction, CW-1 placed a consensually recorded

phone call to the TARGET TELEPHONE. The call was placed on speaker for me to listen,

however there was no answer.

16.     At approximately 1:52 PM, at my direction, CW-1 placed a consensually recorded

phone call to the TARGET TELEPHONE. The call was placed on speaker for me to listen.

During the call, ORTEGA answered and stated, "*I came to the spot to get it, there was somebody here that doesn't let me do shit in front of them so I had to wait for that person to leave, they just left, I am leaving now.*" CW-1 acknowledged and the two attempted to pick a location to meet. ORTEGA explained to CW-1 that he would call him back shortly, he just wanted to *"see where my boy is at"*. The call was subsequently ended. I am familiar with the sound of ORTEGA's voice based on previously a recorded conversation from a controlled purchase and believe the user of the TARGET TELEPHONE was ORTEGA. Based on the recorded conversation, CW-1 and members of law enforcement believed ORTEGA was at the location where he stores his narcotics.

17.     At approximately 2:01 PM, CW-1 received an incoming call from the TARGET TELEPHONE. The call was answered and placed on speaker for me to listen. During the call ORTEGA and CW-1 agreed to meet at AJ's Mini Mart in approximately 10 minutes. I know this location to be located at 939 Social Street, Woonsocket, Rhode Island.

18.     In anticipation of a controlled purchase taking place at this location, the SSGTF initiated surveillance at that location.

19.     Pursuant to the procedures outlined above for a controlled purchase, CW-1 was searched, provided with an audio/video recording device, and $600 in OAF. CW-1 was directed to proceed to AJ's Mini Mart to meet with ORTEGA, and purchase 10 grams of fentanyl. CW-1 was then dropped off at a pre-determined location in the Social Street area.

20.     I surveilled CW-1 as he began walking toward AJ's Mini Mart where he was observed arriving by members of law enforcement at approximately 2:15 PM.

21.     At approximately 2:19 PM, I observed the TARGET VEHICLE driving on Clinton Street toward Social Street in the direction of the anticipated controlled purchase location.

22.     At approximately 2:20 PM, members of law enforcement observed the TARGET VEHICLE enter the parking lot of AJ's Mini Mart. Immediately thereafter, CW-1 was observed entering the passenger side of the TARGET VEHICLE.

23.     At approximately 2:21 PM, members of law enforcement observed CW-1 exit the passenger side of the TARGET VEHICLE and begin walking toward a pre-determined meeting location. The TARGET VEHICLE was observed by law enforcement, exiting the parking lot and driving south on Social Street toward downtown Woonsocket. Law enforcement surveilled the vehicle until approximately 2:23 PM when CW-1 arrived at the pre-determined meeting location. Surveillance was subsequently terminated.

24.     At the pre-determined meeting location, CW-1 provided me with the recorder and a small plastic baggie containing an off-white powdery substance, consistent with the texture and color of fentanyl. Pursuant to the procedures outlined above, CW-1 was searched for money and contraband with negative results. CW-1 was debriefed, and informed me that as he arrived, ORTEGA called him from the TARGET TELEPHONE and told him to go into the store and buy something, so that he does not look suspicious, and he would arrive in a few more minutes. CW-1 stated he went inside the store and purchased a lighter for $2.50. As he exited the store, he observed the TARGET VEHICLE and entered the passenger side of the TARGET VEHICLE where he exchanged the OAF for 10 grams of fentanyl with ORTEGA. ORTEGA offered to give CW-1 a ride which CW-1 declined because he explained to ORTEGA that he was meeting with someone. ORTEGA asked CW-1 if he was dealing narcotics and CW-1 affirmed. After the

12

controlled purchase was finished, CW-1 exited the passenger side of the TARGET VEHICLE and proceeded to the pre-determined meeting location where he met with me. During the search of the CW's person, he provided me with the lighter he purchased which was not on his person during the initial search and explained the above situation.

25.    Members of law enforcement conducted a field test of the suspected fentanyl, which field tested positive for the presence of fentanyl, with a total gross weight of approximately 10.5 grams. The suspected fentanyl will be submitted to the Rhode Island Department of Health Laboratory for further testing, to date there have been no returned results.

26.    I reviewed the DVD containing the audio and video recording of the controlled purchase of fentanyl from ORTEGA. Although the exchange of narcotics for the OAF was not captured on video, I identified ORTEGA as the person CW-1 met with in the TARGET VEHICLE. I also overheard the following conversation:

*ORTEGA: Hey do you want a ride to the hotel?*

*CW-1: Nah I'm good, I'll get dropped off. I got to meet someone up the street.*

*ORTEGA: What you hustlin'?*

*CW-1: Yeah, That's why I am grabbing 10.*

*ORTEGA: Oh, alright. That's smooth.*

*CW-1: I'm trying to not go through my settlement so quick, you feel me? Alright, later.*

27.    In my training and experience, I have learned that T-Mobile is a company that provides cellular telephone access to the general public.  I also know that providers of cellular telephone service have technical capabilities that allow them to collect and generate information about the locations of the cellular telephones to which they provide service, including E-911 Phase II data, also known as GPS data or latitude-longitude data and cell-site data, also known as

13

"tower/face information" or cell tower/sector records.  E-911 Phase II data provides relatively precise location information about the cellular telephone itself, either via GPS tracking technology built into the phone or by triangulating on the device's signal using data from several of the provider's cell towers.  Cell-site data identifies the "cell towers" (i.e., antenna towers covering specific geographic areas) that received a radio signal from the cellular telephone and, in some cases, the "sector" (i.e., faces of the towers) to which the telephone connected.  These towers are often a half-mile or more apart, even in urban areas, and can be 10 or more miles apart in rural areas.  Furthermore, the tower closest to a wireless device does not necessarily serve every call made to or from that device.  Accordingly, cell-site data is typically less precise that E-911 Phase II data.

28.     Based on my training and experience, I know that T-Mobile can collect E-911 Phase II data about the location of the TARGET TELEPHONE, including by initiating a signal to determine the location of the TARGET TELEPHONE on T-Mobile's network or with such other reference points as may be reasonably available.

29.     Based on my training and experience, I know that T-Mobile can collect cell-site data about the Target Telephone.  Based on my training and experience, I know that for each communication a cellular device makes, its wireless service provider can typically determine: (1) the date and time of the communication; (2) the telephone numbers involved, if any; (3) the cell tower to which the customer connected at the beginning of the communication; (4) the cell tower to which the customer connected at the end of the communication; and (5) the duration of the communication.  I also know that wireless providers such as T-Mobile typically collect and retain cell-site data pertaining to cellular devices to which they provide service in their normal course of business in order to use this information for various business-related purposes.

14

30.     As to the TARGET VEHICLE, based on my observations, I know that the TARGET VEHICLE is presently within the District of Rhode Island.

31.     In order to track the movement of the TARGET VEHICLE effectively and to decrease the chance of detection, I seek authorization to place a tracking device on the TARGET VEHICLE while it is in the District of Rhode Island.

32.     To ensure the safety of the executing officers and to avoid premature disclosure of the investigation, it is requested that the court authorize installation, maintenance, and removal of the tracking device during both daytime and nighttime hours. Executing officers will need to install the tracking device during nighttime hours because the daytime visibility of the anticipated location is in an area where executing officers may be observed by the target of the investigation.

33.     In the event the Court grants this application, there will be periodic monitoring of the tracking device during both daytime and nighttime hours for a period not to exceed 45 days following issuance of the warrant. The tracking device may produce signals from inside private garages or other such locations not open to the public or visual surveillance.

## AUTHORIZATION REQUEST (TARGET TELEPHONE)

34.     Based on the foregoing, I request that the Court issue the proposed search warrant, pursuant to Federal Rule of Criminal Procedure 41 and 18 U.S.C. § 2703(c).

35.     I further request, pursuant to 18 U.S.C. § 3103a(b) and Federal Rule of Criminal Procedure 41(f)(3), that the Court authorize the officer executing the warrant to delay notice until 30 days after the collection authorized by the warrant has been completed.  There is reasonable cause to believe that providing immediate notification of the warrant may have an adverse result, as defined in 18 U.S.C. § 2705.  Providing immediate notice to the subscriber or user of the

15

TARGET TELEPHONE would seriously jeopardize the ongoing investigation, as such a disclosure would give that person an opportunity to destroy evidence, change patterns of behavior, notify confederates, and flee from prosecution.  See 18 U.S.C. § 3103a(b)(1).  As further specified in Attachment B, which is incorporated into the warrant, the proposed search warrant does not authorize the seizure of any tangible property.  See 18 U.S.C. § 3103a(b)(2).  Moreover, to the extent that the warrant authorizes the seizure of any wire or electronic communication (as defined in 18 U.S.C. § 2510) or any stored wire or electronic information, there is reasonable necessity for the seizure for the reasons set forth above.  See 18 U.S.C. § 3103a(b)(2).

36.     I further request that the Court direct T-Mobile to disclose to the government any information described in Attachment B that is within the possession, custody, or control of T-Mobile.  I also request that the Court direct T-Mobile to furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the information described in Attachment B unobtrusively and with a minimum of interference with T-Mobile's services, including by initiating a signal to determine the location of the TARGET TELEPHONE on T-Mobiles' network or with such other reference points as may be reasonably available, and at such intervals and times as directed by the government.  The government shall compensate T-Mobile for reasonable expenses incurred in furnishing such facilities or assistance.

37.     I further request that the Court authorize execution of the warrant at any time of day or night, owing to the potential need to locate the TARGET TELEPHONE outside of daytime hours.

38.     I further request that the Court order that all papers in support of this application, including the affidavit and search warrant, be sealed until further order of the Court.  These

documents discuss an ongoing criminal investigation that is neither public nor known to all of the targets of the investigation. Accordingly, there is good cause to seal these documents because their premature disclosure may seriously jeopardize that investigation.

## AUTHORIZATION REQUEST (TARGET VEHICLE)

39.     Based on the foregoing, I request that the Court issue the proposed search/tracker warrant, pursuant to Federal Rule of Criminal Procedure 41 and 18 U.S.C. § 3117, that authorizes members of the FBI or their authorized representatives, including but not limited to other law enforcement agents and technicians assisting in the above-described investigation, to install a tracking device on the TARGET VEHICLE within the District of Rhode Island within 10 days of the issuance of the proposed warrant, to maintain, repair, and/or replace the tracking device as necessary, and to remove the tracking device from the TARGET VEHICLE after the use of the tracking device has ended; to install, maintain, and remove the tracking device during both daytime and nighttime hours; and to monitor the tracking device for a period of 45 days following the issuance of the warrant, including when the tracking device is inside private garages and other location not open to the public or visual surveillance, both within and outside the District of Rhode Island.

40.     In accordance with 18 U.S.C. § 3103a(b) and Federal Rule of Criminal Procedure 41(f)(3), I further request that the warrant delay notification of the execution of the warrant for 30 days after the end of the authorized period of tracking (including any extensions thereof) because there is reasonable cause to believe that providing immediate notification may have an adverse result, as defined in 18 U.S.C. § 2705. Providing immediate notice would seriously jeopardize the ongoing investigation by prematurely revealing its existence, intimidate potential witnesses, notify confederates, and change patterns of behavior.

41.     I further request that the Court seal the warrant and the affidavit and application in support thereof, except that the copies of the warrant in full or redacted form may be maintained by the United States Attorney's Office and may be served on Special Agents and other investigative and law enforcement officers of the FBI, federally deputized state and local law enforcement officers, and other government and contract personnel acting under the supervision of such investigative or law enforcement officers, as necessary to effectuate the warrant. These documents pertain to and discuss an ongoing criminal investigation that is neither public nor known to all the targets of the investigation. Accordingly, there is good cause to seal these documents because their premature disclosure may seriously jeopardize the investigation. Sealing these documents will also better ensure the safety of agents and others.

Respectfully submitted,

JUAN CARLOS RAZON
Special Agent
Federal Bureau of Investigation

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P.  4.1 by _____.
*(specify reliable electronic means)*

_____          _____
*Date*                                         *Judge's signature*

_____          _____, U.S. Magistrate Judge
*City and State*                             *Printed name and title*

## ATTACHMENT A-1

### Property to Be Searched

1.   The cellular telephone assigned call number 401-306-1386 ("TARGET TELEPHONE"), whose wireless service provider is T-Mobile, a company headquartered at 4 Sylvan Way Parsippany, NJ 07054.

2.   Records and information associated with the TARGET TELEPHONE that is within the possession, custody, or control of T-Mobile.

**ATTACHMENT A-2**

**Vehicle to Be Tracked**

1.   The TARGET VEHICLE is described as a 2010 white Toyota Venza, bearing Rhode

Island Registration License plate VA385 and Vehicle Identification Number (VIN)

4T3BK3BB0AU043057. The TARGET VEHICLE is registered to JENNIFER MELENDEZ,

DOB: 1/23/1987, 182 Cumberland Street #67, Woonsocket, Rhode Island. The TARGET

VEHICLE has been observed parked at 752 Social Street, Woonsocket, Rhode Island.

<u>**ATTACHMENT B**</u>

**Particular Things to be Seized**

**I.  Information to be Disclosed by the Provider**

All information about the location of the TARGET TELEPHONE described in Attachment A for a period of thirty days, during all times of day and night.  "Information about the location of the TARGET TELEPHONE" includes all available E-911 Phase II data, GPS data, latitude-longitude data, and other precise location information, as well as all data about which "cell towers" (i.e., antenna towers covering specific geographic areas) and "sectors" (i.e., faces of the towers) received a radio signal from the cellular telephone described in Attachment A.

To the extent that the information described in the previous paragraph (hereinafter, "Location Information") is within the possession, custody, or control of T-Mobile, T-Mobile is required to disclose the Location Information to the government.  In addition, T-Mobile must furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the Location Information unobtrusively and with a minimum of interference with T-Mobile's services, including by initiating a signal to determine the location of the TARGET TELEPHONE on T-Mobile's network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government.  The government shall compensate T-Mobile for reasonable expenses incurred in furnishing such facilities or assistance.

This warrant does not authorize the seizure of any tangible property.  In approving this warrant, the Court finds reasonable necessity for the seizure of the Location Information.  *See* 18 U.S.C. § 3103a(b)(2).


**II.  Information to Be Seized by the Government**

All information described above in Section I that constitutes evidence of violations of 21 U.S.C. §§ 841(a)(1) and 846 involving GREGORY ORTEGA, Date of Birth: 09/15/1989

2